Robert ROBAK and Anna Robak, Plaintiffs-Appellees, Cross-Appellants,

v.

UNITED STATES of America, Defendant-Appellant, Cross-Appellee.

Nos. 81–1038, 81–1099.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1981.

Decided Aug. 25, 1981.

As Corrected Aug. 25, 1981.

Rehearing Denied Nov. 17, 1981.

472

Richard S. Fleisher, Karlin & Fleisher, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Martin B. Lowery, Asst. U. S. Atty., Chicago, Ill., for defendant-appellant, cross-appellee.

Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and GRANT, Senior District Judge.*

SWYGERT, Senior Circuit Judge.

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

This appeal presents a question that has never been decided by a federal court of appeals: whether a cause of action exists for wrongful birth. We hold that it does and affirm the judgment of the district court, which awarded damages to the parents of a child born with defects after a doctor had failed to inform the pregnant mother she had rubella. We reverse the judgment of the district court, however, on two issues raised by the parents in a cross-appeal: the calculation of damages and the method of award of attorneys' fees.

I

In May, 1972, plaintiffs Anna and Robert Robak visited the OB–GYN clinic at Fort Rucker, Alabama, where Mr. Robak, an enlisted man in the United States Army, was stationed. Mrs. Robak, who was then approximately one month pregnant, had developed a rash and a fever. She was examined by Dr. Joshua Roth, who performed a pregnancy test and a blood test for rubella (german measles). Dr. Roth informed Mrs. Robak that she was pregnant and that the test for rubella was negative. Mrs. Robak took a second test for rubella a few days later at the clinic, and this test returned positive. She returned to the clinic regularly for routine examinations during her pregnancy. Neither Dr. Roth nor anyone else at the hospital, however, ever informed Mrs. Robak that she had contracted rubella.[1] She was also never advised of the serious consequences that the rubella virus could have upon her unborn fetus.

Mrs. Robak gave birth to a daughter, Jennifer, on January 12, 1973. At the time of her birth, Jennifer had a rash all over her body. She was also suffering from a loss of hearing, bilateral cataracts, a slight heart defect and possible mental retardation—all common symptoms of a rubella syndrome child. Since then, Jennifer Robak has undergone two operations to re-move cataracts. She has undertaken occupational and physical therapy and special training and education for the deaf-blind. She is industrially blind and has a severe to profound hearing loss; she cannot speak intelligibly. Glasses, contact lenses and hearing aids have been of only limited use. She will need deaf-blind care and supervision for the remainder of her life, as well as further operations.

On September 26, 1977, the Robaks brought this medical malpractice action, which was based on the clinic's negligence in failing to diagnose the rubella and to inform the parents of its possible consequences to the fetus. The Robaks sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. In Counts I and III of the complaint, each of the parents respectively sought recovery of expenses for the care, education and maintenance of their child, Jennifer. Count II was brought on behalf of Jennifer by her father and next friend. This count was dismissed by the district court as not stating a cause of action and is not at issue in the case before us. The district court denied the government's motion to dismiss, or alternatively for summary judgment on, the other counts.

The defendant moved for certification of certain questions of law to the Alabama Supreme Court. The district court granted the motion, but certified instead the question as it was formulated by the plaintiffs.[2] The question and record were filed with the Alabama court on July 5, 1979. On August 15, 1979, the Supreme Court of Alabama unanimously declined to answer the question certified. The district court then certified the question to this court, pursuant to 28 U.S.C. § 1292(b), on September 28, 1979. This court denied leave to appeal on October 24, 1979. The district court later denied further motions by the United States for

1. Mrs. Robak only learned that the second test was positive approximately four years later.

2. The question, as certified, was
   Can the parents of a rubella syndrome child maintain a cause of action for past and future maintenance and care of that child under Alabama law when the parents could have chosen to terminate the pregnancy if the defendant had not failed to diagnose the mother's rubella?

judgment on the pleadings or for summary judgment.

The action was tried from October 7 to October 14, 1980. At the conclusion of the trial, the court ruled orally in favor of the Robaks on the issue of liability but reserved decision on the amount of damages. On November 13, 1980, the court awarded $900,000 in damages to the Robaks—$450,000 to each plaintiff. The court issued a further order on December 9, 1980, that awarded plaintiffs' attorneys 25% of the money that is withdrawn from a reversionary trust established by agreement of the parties. The Robaks will withdraw funds from the trust as money is to be actually expended on Jennifer, and the attorneys shall be paid proportionately with each withdrawal up to a maximum of $225,000. The United States appeals from the order awarding damages to the Robaks. The Robaks also appeal from this order and from the one determining the amount and method of payment of attorneys' fees.

## II

The principal issue in the case is whether a cause of action exists for wrongful birth.[3] Under the Federal Tort Claims Act, we must apply the law as it existed at the time and place of the tort.[4] The United States contends that no such cause of action could have existed in Alabama in 1972 because of the strong public policy of that state at the time against abortions. This argument represents a fundamental mischaracterization of the meaning of *Roe v.*

*Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 694 (1973), and of the nature of the action for wrongful birth.

Alabama has never addressed the issue of an action for wrongful birth. The United States points to two facets of Alabama law that, it contends, indicate that Alabama would have rejected such a cause of action in 1972. We find neither of them to be persuasive. In 1978, the Supreme Court of Alabama held that an action for wrongful life brought by a child did not exist. *Elliott v. Brown*, Ala., 361 So.2d 546 (1978). That case relied in large part on a case decided prior to *Roe v. Wade, Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967), which had held that public policy considerations precluded recognition of an action either for wrongful birth or for wrongful life. Shortly after the *Elliott* decision, however, the New Jersey Supreme Court rejected the reasoning of its *Gleitman* decision. *Berman v. Allen*, 80 N.J. 421, 404 A.2d 8 (1979). In recognizing a cause of action for wrongful birth when the doctor failed to warn the plaintiff mother of the high risk of her bearing a mongoloid child, the court wrote, "Public policy now supports, rather than militates against, the proposition that [the mother] not be impermissibly denied a meaningful opportunity to make [the] decision" whether to have an abortion. 404 A.2d at 14. Moreover, as we have noted, *supra*, n.2, the considerations in an action for wrongful life, such as *Elliott*, are quite different from those in an action like this one for wrongful birth.

---

**3.** The cause of action for wrongful birth, which is brought by the parents of an unwanted child, must be distinguished from that for "wrongful life," which is brought on behalf of the child himself for injuries suffered from a negligent failure to prevent his birth. Every jurisdiction that has considered actions for wrongful life, except for California, has held that no such cause of action exists. *See, e. g., Elliott v. Brown*, Ala., 361 So.2d 546 (1978); *Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Dumer v. St. Michael's Hospital*, 69 Wis.2d 766, 233 N.W.2d 372 (1975); *Jacobs v. Theimer*, Tex., 519 S.W.2d 846 (1975). *But see Curlender v. Bio-Science Laboratories*, 106 Cal.App.3d 811, 165 Cal.Rptr. 477 (1980). Despite the Government's argument to the con-

trary, a child's ability to recover for its injury should not in any way affect the parents' right to recover for the same negligence. Courts that have rejected actions for wrongful life have done so largely because of a reluctance to hold that the child is more injured from having been born than it would have been never having been born in the first place. *See, e. g., Dumer v. St. Michael's Hospital, supra*, 69 Wis.2d at 771–773, 233 N.W.2d 372. An action for wrongful birth, on the other hand, involves different considerations of policy and of perspective. As noted, the issue of wrongful life is no longer before us in this appeal.

**4.** 28 U.S.C. § 1346(b).

■ The United States also emphasizes that in 1972 Alabama law forbade abortions, except as was necessary to preserve the life or health of the mother.[5] Ala.Code, Title 14, § 9 (1972). This statute, argues the Government, demonstrates that an Alabama court would not have recognized an action for wrongful birth in 1972, since it would have been based on the denial of the right to obtain an abortion that was illegal in Alabama.[6] That statement may be correct, but it is irrelevant to our decision here. Unlike a court sitting in Alabama in 1972, we may benefit from the knowledge of developments in the law in the last decade. Roe v. Wade held that statutes such as Alabama's were unconstitutional. In applying the law as it existed at the time of the occurrence of a tort, a court would not follow a law that has since been declared unconstitutional. An Alabama court deciding the issue now would obviously recognize, therefore, that the statute as it was then has no continuing effect.

■ In the absence of any direct precedent from the state involved, a federal court applying state law should consider decisions of its sister states on the same issue. Since Roe v. Wade, these precedents have been unanimous in recognizing a cause of action for the parents of a child born as a result of a physician's negligence.[7] Many

of these cases established liability for a physician's failure to inform parents of a significant risk that the fetus would be born with defects.[8] Two state courts have specifically so held in cases involving rubella syndrome children. In both, the pregnancy occurred, as in this case, before Roe v. Wade. In Jacobs v. Theimer, Tex., 519 S.W.2d 846 (1975), the court noted that even though abortions were illegal in Texas at the time,

> The complaint is not that the defendant doctor failed to perform an abortion or tell Mrs. Jacobs that she should obtain an abortion elsewhere . . . but the plaintiffs contend only that the defendant should have given them information as to Mrs. Jacobs condition and then, with the information she had a right to expect from her doctor, the decision would have been made by the plaintiffs themselves to terminate the pregnancy.

519 S.W.2d at 848 (emphasis in original). In Dumer v. St. Michael's Hospital, 69 Wis.2d 766, 233 N.W.2d 372 (1975), the court also recognized that the choice of whether to obtain an abortion was one for the parents to make. It held they had a cause of action for expenses reasonably suffered as a result of the doctor's failure to diagnose the mother's rubella and to inform her of the consequences.[9]

5. The Robaks do not claim here that an abortion was necessary to protect Mrs. Robak's health.

6. An abortion could, of course, have been obtained elsewhere. See our discussion, infra, pp. 476–477.

7. The United States again relies on two state court decisions that preceded Roe v. Wade: Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967), and Stewart v. Long Island College Hospital, 30 N.Y.2d 695, 283 N.E.2d 616 (1972). Both of these cases have, however, been repudiated in large part in subsequent decisions that recognized wrongful birth actions. Berman v. Allen, 80 N.J. 421, 404 A.2d 8, (1979); Becker v. Schwartz and Park v. Chessin, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978) (consolidated cases). Gleitman and Stewart were based on public policy concerns that have changed dramatically since the constitutional right to an abortion was recognized in Roe.

8. Cases recognizing a cause of action for wrongful birth have involved a number of prenatal conditions. In addition to the two rubella syndrome cases described above (Jacobs and Dumer), they are Karlsons v. Guerinot, 57 A.D.2d 73, 394 N.Y.S.2d 933 (1977) (failure to advise of available amniocentesis test); Berman v. Allen, supra, (Mongolism); Becker v. Schwartz, supra, (Mongolism); Park v. Chessin, supra, (Polycystic Kidney Disease); Speck v. Finegold, 268 Pa.Super. 342, 408 A.2d 496 (1979) (Congenital neurofibromatosis); Gildiner v. Thomas Jefferson Univ. Hospital, 451 F.Supp. 692 (E.D.Pa.1978) (Tay-Sachs Disease).

9. A second line of wrongful birth cases has recognized a cause of action for the parents of children born after a negligently performed sterilization operation. Cockrum v. Baumgartner, 50 U.S.L.W. 2050, 99 Ill.App.3d 271, 425 N.E.2d 968, 54 Ill.Dec. 751 (Ill.App. 1st Dist. 1981); Sorkin v. Lee, 78 A.D.2d 180, 434 N.Y.S.2d 300 (N.Y.Sup.Ct., App.Div., December 23, 1980); Public Health Trust v. Brown, 388

State courts have been quick to accept wrongful birth as a cause of action since *Roe v. Wade*, because it is not a significant departure from previous tort law. A case like this one is little different from an ordinary medical malpractice action. It involves a failure by a physician to meet a required standard of care, which resulted in specific damages to the plaintiffs.[10] The government tries to separate this case from those of ordinary medical malpractice by raising political and moral questions concerning abortions, but the Supreme Court has already settled that issue.[11] In *Roe v. Wade*, the Court held that it was the mother's constitutional right to decide during the first trimester of pregnancy whether to obtain an abortion. The staff at the OB–GYN clinic at Fort Rucker deprived Mrs. Robak of the opportunity to make an informed decision when they failed to tell her of her rubella and of the potential consequences on her fetus. Because of this negligence, the Robaks are faced with large expenses for Jennifer's care and special treatment. As in any other tort case, the defendant must bear the burden for injuries resulting from its own negligence. "Any other ruling would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses, which, if born, would suffer from genetic [or other] defects." *Berman v. Allen, supra,* 404 A.2d at 14. The district court was therefore correct in holding that the Robaks' complaint stated a valid cause of action in wrongful birth.

### III

The United States contends that even if a valid cause of action exists, there is no proximate cause in this case between the military clinic staff's negligence and the injuries suffered by the Robaks. It bases this argument on two separate reasons, neither of which is compelling.

First, it asserts that Mrs. Robak could not have obtained a legal abortion in Alabama in May, 1972. The fallacy of this argument is obvious. Mrs. Robak could have travelled to any of the states that then permitted abortions, including New York, Maryland, Kansas or New Mexico.[12] It is quite common for persons to travel to other jurisdictions in order to avoid restrictive laws in their home state or to take advantage of more lenient laws in another state, and it is perfectly lawful for one to advise another

So.2d 1084 (Fla.Ct.App., 1980); *Mason v. Western Pennsylvania Hospital,* —— Pa.Super. ——, 428 A.2d 1366, 1367 (1981) (*en banc*); *Custodio v. Bauer,* 251 Cal.App.2d 303, 59 Cal.Rptr. 463 (1967) (negligent sterilization); *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1976) (failure to diagnose pregnancy); *Anonymous v. Hospital, et al.,* 33 Conn.Sup. 125, 366 A.2d 204 (1976) (negligent sterilization); *Troppi v. Scarf,* 31 Mich.App. 240, 187 N.W.2d 511 (1971) (negligent supplying of contraceptives); *Bushman v. Burns Clinic Medical Center,* 83 Mich.App. 453, 268 N.W.2d 683 (1978) (negligent sterilization); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977) (negligent vasectomy); *Betancourt v. Gaylor,* 136 N.J.Super. 69, 344 A.2d 336 (1975) (negligent sterilization); *Bowman v. Davis,* 48 Ohio St.2d 41, 356 N.E.2d 496 (1976) (negligent sterilization); *Bishop v. Byrne,* 265 F.Supp. 460 (S.D.W.Va.1967) (negligent sterilization). *See also,* "Tort Liability for Wrongful Birth," 83 ALR3d 15.

10. In *Becker v. Schwartz, supra,* plaintiff mother's physician failed to warn her of the increased risk of mongolism in children born to women over 35 years of age, although she was then 37 years old and pregnant. The New York Court of Appeals recognized that

[i]rrespective of the label coined, plaintiffs' complaints sound essentially in negligence or medical malpractice. . . .

Plaintiffs state causes of action in their own right predicated upon a breach of a duty flowing from defendants to themselves, as prospective parents, resulting in damage to plaintiffs for which compensation may be readily fixed.

386 N.E.2d at 811, 813.

11. *See Jacobs v. Theimer, supra,* 519 S.W.2d at 848 ("We do not regard the issue before us as requiring our decision of the public policy for or against abortion").

12. N.Y.Penal Law, Part 3, Section 125.05(3) (effective 1970); Md.Code Ann., Art. 43, Section 137(a)(3) (effective 1970); N.M.Stat.Ann., Section 40A–5–1(C)(2) (effective 1969); Kan.Crim. Code, Ch. 21, Section 3407(2) (effective 1970).

to do so.[13] People travel to Nevada to gamble or to gain a quick marriage or divorce; they travel across state lines in order to purchase liquor cheaper or at a younger age. Corporations incorporate in Delaware. Mrs. Robak testified that she would have sought an abortion if she had known she had rubella. Even her treating physician, Dr. Roth, who testified he was never informed of the results of the second test, declared under oath that if he had known of the results, he would have recommended that she terminate the pregnancy. Therefore, it can clearly be said that but for defendant's negligent failure to inform Mrs. Robak of her rubella and its consequences, she would have obtained an abortion and the Robaks would not have suffered the damages for which they seek recovery.[14]

■ The Government also argues no proximate cause exists because irrevocable injury to the fetus had already occurred before the negligent acts were committed. Once Mrs. Robak was infected by the rubella virus, the harm to Jennifer Robak had already been done. This contention misstates the nature of the test for proximate cause. A negligent act need not be the sole cause of the injury complained of in order to be a proximate cause of that injury. Moreover, the cause of action is not based on the injuries to the fetus but on defendant's failure to diagnose Mrs. Robak's rubella and inform her of the consequences.[15] Alabama uses the "but-for" test for proximate cause. See, e. g., Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758, 761 (1973). If the clinic staff had not breached its duty to Mrs. Robak, she would have had a legal abortion that would have saved the Robaks from the damages they have incurred.[16] Defendant's negligence was therefore a proximate cause of their injuries.

## IV

■ The parties disagree about the proper standard of care that was to be applied in this case. The Robaks contend that the district court properly applied as the standard that which is practiced in military hospitals by military physicians. The Government argues that Alabama's "same general neighborhood" rule applied. This dispute is a trivial one, however, for the Robaks proved the clinic staff breached its duty under either standard. They presented the expert testimony of Dr. Martin Kass, who in addition to his general qualifications in the field of obstetrics and gynecology, practiced in that field while on active military duty from 1969 to 1971. He testified that the failure to diagnose the rubella and inform Mrs. Robak of its consequences violated the standard of military care as he knew it at the time. The Government did not present any contradictory evidence concerning the standard of care.

Even if the Government is correct that the Alabama rule applies, the testimony of Dr. Kass still suffices. The Alabama Supreme Court has interpreted the statutory "same general neighborhood" rule[17] "to refer to the national medical neighborhood or

13. As the district court noted in its oral ruling on the issue of liability, to hold otherwise, "half the attorneys in the city of Chicago that are involved in matrimonial law would be in violation of that law."

14. The United States argues that proximate cause cannot be based on the ability to seek an abortion in another state, for an Alabama court in 1972 would not have recognized such an action as legitimate but rather as a flaunting of the state's authority. As we have discussed, supra, p. 474, any such refusal to recognize the right of a mother to an abortion during the first trimester would have been unconstitutional under Roe v. Wade. We must assume an Alabama court would have decided the issue in a constitutional manner.

15. Dumer v. St. Michael's Hospital, supra, 69 Wis.2d at 776, 233 N.W.2d 372.

16. See Becker v. Schwartz, supra, 386 N.E.2d at 813.

17. The Alabama rule is set forth in Title 6, § 6–5–484(a) of the Alabama code:

   In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case ...

national community, of reasonably competent physicians *acting in the same or similar circumstances.*" *Zills v. Brown*, Ala., 382 So.2d 528, 532 (1980).[18] Dr. Kass did not therefore need to know the standard that was practiced in Alabama in 1972, as the Government contends. He functioned as an obstetrics-gynecology specialist in similar circumstances, a military hospital, during the same period as those physicians and staff who took care of Mrs. Robak. His testimony was thus equally competent to establish the standard of care under the Alabama rule.

## V

The parties raise several issues regarding damages in this case. The United States contends that the damage award was too high, and the Robaks argue on cross-appeal that it was too low. The Robaks also cross-appeal the district court's order concerning the amount and manner of payment of attorneys' fees.

## A

■ The Government's argument borders on the frivolous. It contends that the award of $450,000 to each parent is duplicative, since their claims were identical. This assertion ignores the plain text of the district court's memorandum order of November 13, 1980. The court found that the Robaks had proved $900,000 in damages to compensate them for their past and future expenses for their care of Jennifer. The court simply divided the recovery between the parents—$450,000 to each—"since both parents are equally and separately liable under the law for Jennifer's maintenance during her minority and impaired adulthood."[19] Because of the joint and severa-

ble liability of the parents,[20] it is perfectly proper for them to file separate claims to protect themselves against possible unforeseen development, so long as the total recovery does not exceed their combined expenses.

In this case, the Robaks have shown damages of at least $900,000. These costs included past expenses of nearly $30,000; the cost of residential education and care to age 21, discounted to present value ($229,800); the cost of a qualified companion, skilled in sign language and experienced in dealing with emotionally disturbed persons, for the remainder of Jennifer's adult life, or comparable institutional care ($515,000); and the cost of maintaining her for her adult life, since she will never be self-supporting ($200,000). The separate award of half that sum to each parent could in no way constitute duplicate recovery.

## B

■ The district court awarded these damages for the special costs the Robaks will incur in maintaining their rubella syndrome child. It reduced these damages by an unspecified amount for what the court considered to be the cost of raising and supporting a normal child.[21] In a cross-appeal, the Robaks contend that the court erred in reducing the award by that amount. We agree.

■ As discussed above, this case is governed by ordinary tort principles. It is a fundamental tenet of tort law that a negligent tortfeasor is liable for *all* damages that are the proximate result of his negligence. Alabama has followed this rule in other medical malpractice actions.[22] Some

18. *See also Baker v. Chastain*, Ala., 389 So.2d 932 (1980).

19. Memorandum Order, 503 F.Supp. 982, 983 n.1 (1980).

20. 59 Am.Jur.2d, Parent and Child, §§ 50, 61, 101–103.

21. Memorandum Order, *supra*, 983 n.2. The only evidence submitted that concerned the cost of raising a healthy child was a newspaper

article bearing the headline, "It costs $85,000 to raise a child." A reduction of a damage award based on such unsupported evidence would be improper, but it is not relevant to our decision here, since we hold that the court should not have deducted the cost of a normal child in the first place.

22. *Snow v. Allen*, 227 Ala. 615, 151 So. 468 (1933).

decisions have deducted the costs of a normal child in determining damages in wrongful birth actions,[23] but the majority of state courts have allowed recovery of these costs.[24]

The approach of the district court in this case—and of the states that have denied recovery of these costs—is, however, inconsistent with these principles. As noted, *supra*, part III, this action for wrongful birth is not based upon the injuries to the child. If it were, then no recovery at all would be possible, for those injuries occurred as soon as Mrs. Robak contracted rubella, before the negligent acts of the Fort Rucker clinic staff. The action is based rather on the negligent failure by the staff to diagnose the rubella and inform Mrs. Robak of it. If they had not breached their duty, Mrs. Robak would have obtained an abortion. Jennifer's birth, and all expenses resulting therefrom, were thus the proximate result of defendant's negligence. As the court noted in *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496, 508, "[B]ut for the defendants' breach of duty to properly treat and advise the plaintiff-parents, they would not have been required to undergo the expenditures alleged." [25] These expenditures must include the costs of raising a normal child, for the Robaks would not have had to bear them but for defendant's negligence. We therefore reverse this holding of the district court and remand the case for a

new determination of damages consistent with this opinion.

C

■ The Robaks also cross-appeal the district court's order of December 9, 1980, which concerned the amount and manner of payment of attorneys'/fees. The court had ruled in its November 13 order that the $900,000 in damages was to be placed in a reversionary trust, established by agreement of the parties, out of which the Robaks would withdraw money as they need it to cover expenses for Jennifer. Under the December 9 order, plaintiffs' attorneys are to be paid their fee, a percentage of the recovery, only proportionately to and concurrent with the actual disbursement of funds from the trust.

This ruling by the district court was beyond its authority. Before 1966, the Federal Tort Claims Act provided the district court with discretion to determine the attorneys' fees to be paid in such actions.[26] In 1966, Congress amended the operative section, § 2678, to read as follows:.

> No attorney shall charge, demand, receive or collect for services rendered, fees in excess of 25 *per centum* for any judgment rendered pursuant to section 1345(b) of this title. . . .

Congress purposefully removed this matter from the discretion of the district court, so long as the fee fell within the section's

---

**23.** *Jacobs v. Theimer, supra; Dumer v. St. Michael's Hospital, supra; Sorkin v. Lee, supra: Public Health Trust v. Brown, supra.* The latter two cases are distinguishable, for they both involve the birth of a healthy child after a negligent sterilization operation. The parents in each case knew the mother was pregnant within the first trimester of pregnancy. It was thus their decision to have the child after the effects of the defendants' negligence was discovered. Because they freely chose not to have an abortion, they should be responsible for the costs of a normal child.

**24.** *See, e. g., Mason v. Western Pennsylvania Hospital, supra; Speck v. Finegold, supra; Stills v. Gratton, supra; Anonymous v. Hospital, supra; Betancourt v. Gaylor, supra; Bowman v. Davis, supra; Sherlock v. Stillwater*

*Clinic, supra; Troppi v. Scarf, supra. See also Curlender v. Bio-Science Laboratories, supra,* in which punitive damages were allowed as well in a wrongful life action.

**25.** *See also Becker v. Schwartz, supra,* 386 N.E.2d at 813; *Betancourt v. Gaylor, supra,* 344 A.2d at 340.

**26.** Section 2678 of the Act provided before the 1966 amendment, in relevant part,

> The Court rendering a judgment for the plaintiff . . . may, as part of such judgment, . . . determine and allow reasonable attorney fees, which if the recovery is $500 or more, shall not exceed . . . 20 per centum of the amount recovered under section 1346(b) of this title, to be paid out of but not in addition to the amount recovered . . .

guidelines of 25 percent.[27] The contract between the Robaks and their counsel agreed upon a fee of 25 percent, within the statutory limits. The court thus had no choice but to accept this pre-existing arrangement.[28]

We therefore remand the case to the district court with instructions to vacate its order of December 9.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

**27.** The Senate Report concerning the 1966 amendment clearly expressed this intent:

> The language of the committee amendment merely places a limit of fees and removes from the section the requirement of agency or court allowance of the amount of attorney fees. The actual amount of attorney fees within the statutory limits, therefore, is made a matter for determination between the litigant and his attorney.

Senate Report No. 1327, 1966 U.S.Code & Cong. and Adm.News, p. 2515.

**28.** We note also that the formula developed by the district court would have a significant chilling effect on counsel bringing such action, for their fee would be contingent on future events that might have nothing to do with the merits of the case or the competence of their representation of their client. If Jennifer Robak were to die accidentally of causes completely unrelated to her rubella syndrome, for example, counsel here would receive a very small fee for very extensive efforts.