| ESTATE OF JULIE AMOS and | ) | |
|---|---|---|
| RONALD AMOS, | ) | |
| | ) | |
| Plaintiffs/Appellees, | ) | |
| | ) | Appeal No. |
| v. | ) | M1999-00998-COA-R3-CV |
| | ) | |
| VANDERBILT UNIVERSITY, INC. | ) | |
| d/b/a VANDERBILT UNIVERSITY | ) | |
| MEDICAL CENTER, | ) | Davidson Circuit |
| | ) | No. 90C-4158 |
| Defendant/Appellant. | ) | |

**FILED**

**March 31, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

## COURT OF APPEALS OF TENNESSEE

### APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

### AT NASHVILLE, TENNESSEE

### THE HONORABLE HAMILTON Y. GAYDEN, JUDGE

ABBY R. RUBENFELD
Rubenfeld & Associates
2505 Hillsboro Road, Suite 201
Nashville, Tennessee 37212

A. BRUCE JONES
PATRICIA DEAN
Holland & Hart
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado 80201-8749
    ATTORNEYS FOR PLAINTIFFS/APPELLEES


E. CLIFTON KNOWLES
JOHN S. BRYANT
STEVEN E. ANDERSON
Bass, Berry & Sims
2700 First American Center
Nashville, Tennessee 37238-2700
    ATTORNEYS FOR DEFENDANT/APPELLANT

AFFIRMED IN PART
REVERSED IN PART
AND REMANDED AS MODIFIED


WILLIAM B. CAIN, JUDGE

# O P I N I O N

This case represents another chapter in a protracted suit filed by a father and mother against a healthcare provider for the alleged wrongful birth of their daughter. The child, Alison Amos, was born in September of 1989, having been infected with the Human Immunodeficiency Virus (HIV) *in utero* through her mother Julie.[1] In 1989 an HIV positive diagnosis brought with it a myriad of possible infections, such as pneumocystis carinii. As mild as these infections might be to a healthy immune system, in an immuno-deficient environment, especially that of an infant, just one such infection could spell disaster. Two months after her birth, Alison developed pneumocystis pneumonia, a common AIDS related infection, and died four days later.

Julie Story Amos[1], Alison's mother, was infected with HIV when she was transfused with four units of blood during a cosmetic operation performed at Vanderbilt University Medical Center (hereinafter Vanderbilt) in August of 1984. Vanderbilt received those units from the regional blood blank of the American Red Cross. At the time of the operation, the HIV virus had not been isolated, therefore no test was available to screen blood prior to transfusion. At that time Vanderbilt had no procedure for informing transfused patients that they had received blood during surgery.

By the Spring of 1985 the HIV virus had been isolated, and Vanderbilt, as well as many other medical facilities across the country, was actively screening the blood given to current transfusion recipients. However, many of these facilities, including Vanderbilt, elected not to identify or warn former prior transfusion recipients that they could have been exposed to the HIV virus. As a result, some of these former patients led their lives infected and unaware. Julie Story lived thus for five years. In that time she met and married Ronald Amos. Together they built a family with her two children from a previous marriage. In addition and most importantly, she gave birth to daughter Alison. Julie did not know her HIV status

---

[1]Julie Story Amos died from complications related to AIDS in April of 1992. The case at bar concerns no claim for the wrongful death of Julie Amos.

until after Alison was hospitalized.

## I.    PROCEDURAL HISTORY AND POSTURE

Alison died on Monday, November 28, 1989. Ron and Julie Amos, as Plaintiffs "Doe," filed suit in Davidson County Circuit Court against Vanderbilt and the American Red Cross in March of 1991. The complaint alleged, *inter alia*, the following:

> 19. At no time from March of 1985 until the present did [the Defendants] inform Plaintiff JANE DOE that she had received a transfusion of blood or that she was at risk for HIV-infection.
>
> *  *  *
> (Wrongful Birth)
> *  *  *
>
> 26. As a direct and proximate result of the grossly negligent, careless and reckless acts and omissions of the Defendants and their agents, to wit, the failure of Defendants to notify Plaintiff JANE DOE that she had received a transfusion of blood and/or HIV-infected blood in 1984 and was at risk for HIV-infection, Plaintiffs Jane and John Doe failed to take precautions to prevent the birth of an HIV-infected infant.
>
> 27. As a direct and proximate result of the grossly negligent, careless and reckless conduct of Defendants, Plaintiffs JANE DOE and JOHN DOE have suffered and will continue to suffer additional medical expenses, pain and suffering, disability, emotional distress, anguish, humiliation and other forms of emotional and psychological injury.

In April of 1991 the Red Cross removed the case to federal court. For reasons not germane to the issues before us, the case was remanded back to state court and again removed to federal court. After this second removal the Plaintiffs settled with the American Red Cross. The federal district court declined to exercise further jurisdiction over the case, and the cause was thus returned to state court.

Post discovery Vanderbilt successfully argued its pretrial motion for summary judgment on the ground that Plaintiffs failed to show a violation of the applicable standard of care consistent with Tennessee's Medical Malpractice Act. *See* Tenn. Code Ann.§29-26-115. The Plaintiffs appealed to this Court, and on May 30, 1997, we released our opinion holding expert opinion unnecessary to establish

3

Plaintiffs' *prima facie* case. This Court stated the following:

> As we have stated, Vanderbilt's decision not to implement a notification policy was not "a matter of medical science or art requiring specialized skills." In so holding, we do not dispute that medical expert testimony would be important to assist a jury in determining the notification issue on the merits. However, we agree with New York's supreme court that the need for expert testimony does not always signify medical malpractice. *See Weiner v. Lenox Hill Hosp.,* 88 N.Y.2d 784, 650 N.Y.S.2d 629, 632, 673 N.E.2d 914, 917 (1996). Under these facts, we do not think that scientific data and knowledge on which Vanderbilt relied in making the decision indicates that this case sounds in medical malpractice.
>
> For the foregoing reasons, we conclude that Vanderbilt was not engaging in the practice of medicine when it decided in the late 1980's not to implement a policy to notify former patients who had received blood prior to March of 1985 that they had received blood which was not tested for the HIV virus. Thus, the trial court erred in requiring the plaintiffs' expert proof to comply with the Tennessee Medical Malpractice Act and it erred in granting summary judgment to the defendant when the plaintiffs failed to so comply. In light of this error, we reverse the trial court's grant of summary judgment and remand this case to the trial court so that it may be considered on the merits.

*Estate of Doe v. Vanderbilt University, Inc.,* 958 S.W.2d 117, 122-23 (Tenn. Ct. App. 1997).

No additional discovery was taken, and the case proceeded to trial. The plaintiffs presented proof regarding the alleged duty to warn Julie Amos of the possibility that she had been infected with HIV in 1984 and of the need to be tested for the virus. In addition, proof was taken concerning the manner in which Ron and Julie Amos were informed about Alison's and Julie's HIV status. The medical and funeral expenses associated with Alison's birth and death were shown to be $32,884.07.

Plaintiffs attempted to prove the emotional damage associated with Alison's birth and death, using their own testimony and the testimony of their relatives. In addition, two of Plaintiffs' expert witnesses testified in general terms regarding the emotional impact of an AIDS diagnosis connected with the death of a child infected

4

*in utero.* While these experts testified in generalities, neither testified as to the severity of the emotional distress suffered by either Ron or Julie Amos.

Both at the close of Plaintiffs' proof and at the close of all the proof, Defendant Vanderbilt moved for a directed verdict on the emotional damages portion of the plaintiffs' claims. The court denied those motions, finding the emotional damages to be "parasitic" to the cause of action for negligence, finding direct lay testimony as to the emotional injury suffered by the plaintiffs, and taking judicial notice of the devastating emotional effect of an AIDS diagnosis on the plaintiffs. The case was thus submitted to the jury. After consideration, the jury found the following as evidenced in its verdict form:

1. Do you find the defendant Vanderbilt University negligent?
   Yes: X    No: __

2. Do you find the defendant's negligence to be the legal cause
   of any injury to:
   a. The estate of Julie Amos?
        Yes: X    No: __
   b. Ronald Amos?
        Yes: X    No: __
                    * * *
3. Decide the total amount of damages sustained by each
   plaintiff:
   Estate of Julie Amos: $2,722,500
   Ronald Amos:          $1,639,200

Defendant Vanderbilt, now seeks relief from the jury verdict below, raising several issues on appeal. Of these issues, the Court finds the following dispositive:

1. Whether Plaintiffs Amos properly proved entitlement to damages for their emotional injury?

2. Whether Vanderbilt owed a duty to Ronald Amos to warn Julie Amos of the possibility that she had been exposed to HIV in 1984?

## II.    THE DUTY OWED TO RONALD AMOS

In the interest of clarity, we address Vanderbilt's second issue first. It is argued that Vanderbilt owed no duty to Mr. Amos. Absent proof of this duty, there

5

is no negligence claim on his behalf. It is well to note that were Tennessee to recognize "wrongful birth" as a separate cause of action from one for negligence, the resolution of this issue might be different. *See Andalon v. Superior Court*, 208 Cal. Rptr. 899, 905 (Call. App. 1984). However, Tennessee does not recognize "wrongful birth" as anything other than a claim for ordinary negligence. *See Owens v. Foote,* 773 S.W.2d 911, 913 (Tenn. 1989). The same elements must be made out in Mr. Amos' cause as are to be made out for the estate of Julie Amos. The most troubling of these elements is duty.

Although the jury awarded Mr. Amos over a million dollars in damages, the plaintiffs failed to show that Vanderbilt owed any duty to Mr. Amos. It also bears noting that Julie Story and Ronald Amos began a romantic relationship four years after Ms. Story was infected via transfusion. The plaintiffs assert that damages to Ronald Amos flow as a direct consequence from Vanderbilt's failure to warn Julie Story of her HIV status. While this assertion addresses the factual causal connection between Vanderbilt and Ronald Amos, it fails to address a bigger issue.

The existence of duty is as much a question of public policy as it is a question of law for the court. *See Bain v. Wells* 936 S.W.2d 618, at 625 (Tenn. 1997) (citing *Bradshaw,* 854 S.W.2d 865, at 870 (Tenn. 1993)). The Tennessee Supreme Court has "specifically recognized that a physician may owe a duty to a non-patient third party for injuries caused by the physician's negligence." *Bradshaw v. Daniel,* 854 S.W.2d 865, at 870 (Tenn. 1993) (citing *Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521, 526 (Tenn. 1980)). However, that third party must be an identifiable plaintiff, and the imposition of liability must not expose the defendant to "liability indeterminate as to amount, time, class, or number." *See Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521, 526 (Tenn. 1980) (citing *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931)). The plaintiffs would argue that Vanderbilt owed a duty to Ron Amos as a foreseeable husband to Julie and father to Alison. Following this reasoning, any other party who would run the risk of emotional injury via intimate contact with Julie Story during the time that Vanderbilt chose not to warn her of her possible HIV status would enjoy the benefit of a duty on Vanderbilt's part.

The proof in the record shows no continuing relationship between Vanderbilt and Julie Story following her surgery in 1984. Vanderbilt had no contact with Julie Story until she and her husband Ronald Amos checked into Vanderbilt Hospital with Alison. As soon as Alison was diagnosed, each member of Alison's immediate family was tested, including Ronald Amos. Yet the plaintiffs argue Vanderbilt's duty to warn Julie Story flowed to Mr. Amos long before they even met. These facts distinguish this case from *Bradshaw, supra.* That case concerned a family already in existence at the time the alleged duty arose. The nature of the duty established in *Bradshaw* was to advise the existing immediate family members of risks attendant to a spotted fever diagnosis. *See Bradshaw v. Daniel*, 854 S.W.2d, at 871. The Court specifically held that the existence of the physician-patient relationship is sufficient to impose upon a physician an affirmative duty to warn identifiable third persons in the patient's immediate family against foreseeable risks emanating from a patient's illness. *See Bradshaw, id.,* at 872. The physician-patient relationship must be of such a character, or the plaintiff's potential harm (not his or her mere existence), must be so apparent as to impose upon the defendant a duty to act or refrain. *See Turner v. Jordan,* 957 S.W.2d 815, at 818 (Tenn. 1997); *see also Bradshaw, supra*, at 872; *Wharton Transport Corp., v. Bridges,* 606 S.W.2d 521, 526 (Tenn. 1980). Even if Vanderbilt was aware of the possibility that Julie Story would meet a man and have a baby, under the facts as they were shown by the plaintiffs, Mr. Amos was not identifiable during the period of inaction so as to justify imposing a duty on Vanderbilt.

At the time Julie Story received the transfusion in 1984, she was a divorced, 25-year-old-woman, embarking on a brand new future. Five years later, after having endured the hardship of divorce, she would meet Ronald Amos and begin thinking again about a family. Her choices, informed or not, would set the course of her life and have an impact on others. The ever widening arc of cause and effect would encompass everyone in her life to come. For this Court to impose liability on Vanderbilt for the emotional injuries to Mr. Amos, we would necessarily have to hold that, after receiving a warning concerning her HIV status, Julie Story would have taken one of myriad options available to her; and that Ronald Amos, had he been in Julie Story's life, would have taken steps to avoid the birth, and that those steps would have indeed avoided the pain of watching a child die from HIV.

This Court is unwilling to so hold. Mr. Amos was not an identifiable party at the time Vanderbilt's duty arose; nor was injury to Mr. Amos foreseeable at the time. Inasmuch as we find error in the portion of the trial court's order imposing a duty on Vanderbilt with regard to the plaintiff Ronald Amos, we therefore must vacate the jury award as to Mr. Amos. *See* Tenn. R. App. P. 13(a); *Bradshaw v. Daniel*, 854 S.W.2d 865, at 869 (Tenn. 1993).

## III.     EMOTIONAL INJURY AND EMOTIONAL DISTRESS

Although the case before us on appeal has been described by the parties as concerning "failure to warn" and "wrongful birth," there can be no argument that this case sounds in negligence. The first appeal in this case resolves this much. *See Estate of Doe v. Vanderbilt Univ., Inc.* 958 S.W.2d 117 (Tenn. Ct. App. 1997). The appellees argue that the case at bar is not an action for negligent infliction of emotional distress. They assert that this claim is for "wrongful birth" and, therefore, distinct from an action in negligence which results in emotional injury. Their argument suggests a distinction without a difference.

While the concept is relatively novel in the legal universe, there have been several cases concerning the different types of action which form a broad swath of juridical fabric styled "wrongful birth." *See* 83 ALR3d 15§2; *see also PRENATAL INJURIES*, 62A Am. Jur. 2d §89 p.454. Specifically our state supreme court has had this to say about the concept and classifications:

> 1. Wrongful pregnancy or conception is an action brought by the parents on their own behalf to recover damages resulting from a failed pregnancy avoidance technique (e.g., vasectomy, tubal ligation, abortion, misfilled birth control prescription, etc.); usually the resulting child is healthy. *See, e.g., Miller v. Johnson,* 231 Va. 177, 343 S.E.2d 301 (1986); *Garrison v. Foy,* 486 N.E.2d 5 (Ind.App.1985); *Nanke v. Napier,* 346 N.W.2d 520 (Iowa 1984); *Weintraub v. Brown,* 98 A.D.2d 339, 470 N.Y.S.2d 634 (1983); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977).
>
> 2. Wrongful birth is an action by the parents on their own behalf to recover damages for the birth of an impaired child when the impairment results either from an act or omission of the defendant or because the defendant failed to diagnose or discover a genetic defect (e.g., genetic counsel[l]ing, failure to perform readily available diagnostic tests, etc.) in the parents or the infant

in time to obtain a eugenic abortion or to prevent pregnancy altogether. *See, e.g., James G. v. Caserta,* 332 S.E.2d 872 (W.Va.1985) (Involving two causes of actions); *Harbeson v. Parke-Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983) (En banc ); *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982); *Stribling v. deQuevedo,* 288 Pa.Super. 436, 432 A.2d 239 (1980); *Howard v. Lecher,* 42 N.Y.2d 109, 397 N.Y.S.2d 363, 366 N.E.2d 64 (1977); *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967).

*Smith v. Gore*, 728 S.W.2d 738, 741 (Tenn. 1987). The Court expanded upon this discussion in its opinion in *Owens v. Foote.* The plaintiffs in *Owens* traveled on the assertion that the physician defendant had "negligently performed a vasectomy on Mr. Owens, negligently failed to conduct and interpret post-operative tests, and failed to advise plaintiffs correctly about the test results." *Owens v. Foote,* 773 S.W.2d 911, 911-912 (Tenn. 1989). In noting the procedural posture of the *Owens* appeal at *Smith's* release, Justice O'Brien wrote:

> [W]hile this case was in the appellate process the decision of this Court in *Smith v. Gore,* 728 S.W.2d 738 (Tenn.1987) was released. Many of the questions raised here were answered in the *Smith* decision by Justice Drowota. In passing, the Court noted the several cases reported nationally involving actions of this nature, including their various denominations. Reference is made to p. 741 for the definition of wrongful birth. However, medical malpractice suits of this nature, brought by parents, alleging birth defects of an infant, are not unknown in this State and we see no reason to endeavor to fit them into some specific category beyond a suit for ordinary negligence. *See, e.g., Schaefer by Schaefer v. Larsen,* 688 S.W.2d 430 (Tenn.App.1984).

*Owens v. Foote,* 773 S.W.2d 911, 913 (Tenn. 1989). Hence the characterization "wrongful birth" does nothing to further the discussion of Vanderbilt's alleged omission. The key elements of a cause of action sounding in negligence are well known. To establish a prima facie case, a plaintiff must prove that the defendant breached an established duty, and that such breach proximately or legally caused injury to the plaintiff. *See Kilpatrick v. Bryant,* 868 S.W.2d 594, 598 (Tenn.1993); *see also Bradshaw v. Daniel,* 854 S.W.2d 865, 873 (Tenn. 1993). For the Estate in the case at bar, the most difficult of these elements is injury. The vast discrepancy between the medical damages proven and the general damages awarded, as well as the statements in the pleadings describing emotional distress allegedly caused by

9

Vanderbilt's failure to warn Mrs. Amos of her possible HIV status, suggests that the majority of the $4.3 million dollars of damages was awarded to compensate for the Amoses' emotional injury. It is not surprising, therefore, that upon remand Vanderbilt's counsel argued the requirement of expert testimony to prove the emotional injury suffered by the plaintiffs. This argument was based on our supreme court's opinion in the case of *Camper v. Minor*. In that case, a truck driver, who suffered no substantial physical injury, sued a negligent motorist's estate, seeking damages for post traumatic stress disorder. The Court considered this claim to be one of negligent infliction of emotional distress. Said the court:

> Any survey of the law in this area must begin with a clear and frank recognition that the law of negligent infliction of emotional distress, however it is formulated in a specific jurisdiction, is fundamentally concerned with striking a balance between two opposing objectives: first, promoting the underlying purpose of negligence law--that of compensating persons who have sustained emotional injuries attributable to the wrongful conduct of others; and second, avoiding the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of these injuries. The tension produced by this ongoing attempt to winnow out invalid claims at the summary judgment level has caused inconsistency and incoherence in the law; indeed, as the Washington Supreme Court aptly stated some years ago, "any attempt at a consistent exegesis of the authorities is likely to break down in embarrassed perplexity." *Hunsley v. Giard,* 87 Wash.2d 424, 553 P.2d 1096, 1098 (1976).

*Camper v. Minor*, 915 S.W.2d 437, 440 (Tenn. 1996).

The Court went on to discuss the requirement placed upon an individual seeking compensation for mental injury. The Court in *Camper* considered the various attempts taken in Tennessee to weigh the considerations enumerated *supra*. Reference is made in *Camper* to the inconsistent body of law concerning the general rule limiting remedy for emotional injury absent a "physical manifestation" of that injury. *See Camper,* 915 S.W.2d, at 444-46 (quoting *Memphis State Ry. Co. v. Bernstein*, 137 Tenn. 637, 194 S.W. 902 (1917)). After exhaustive review the Court noted the following:

> Tennessee courts have continually found it necessary to deviate from the "physical manifestation" rule by either formally creating exceptions to the rule or by applying the rule in a nonrigorous fashion. This practice of creating ad hoc exceptions has made our law of negligent infliction of emotional distress confusing and

10

unpredictable; indeed, the practice appears to have, as the plaintiff here argues, "robbed the law of logic, consistency and fairness."

Although there is some truth to this charge, the Tennessee cases in this area do contain a common thread: the courts' desire to separate, at the prima facie stage and in a meaningful and rational manner, the meritorious cases from the nonmeritorious ones.

915 S.W.2d 437, at 445-46. It was against this backdrop that the Court adopted the most recent rule concerning claims for negligent infliction of emotional distress. Said the Court:

Although our seemingly disparate cases in this area are thus reconcilable on a functional level, we nevertheless agree with the plaintiff here and with many other jurisdictions that the time has come to abandon the rigid and overly formulaic "physical manifestation" or "injury" rule. This rule has proved to be inflexible and inadequate in practice; and, as noted in the preceding section, it completely ignores the fact that some valid emotional injuries simply may not be accompanied by a contemporaneous physical injury or have physical consequences. Therefore, in accordance with our statement in *Carroll* that "[we have] realized that in some situations, whether the plaintiff has incurred a literal physical injury has little to do with whether the emotional damages complained of are reasonable," *id.* at 594, we conclude that the rule shall no longer be used to test the validity of a prima facie case of negligent infliction of emotional distress.

This negative conclusion logically raises its positive counterpart: what is required to make out a prima facie case? After considering the strengths and weaknesses of the options used in other jurisdictions, we conclude that these cases should be analyzed under the general negligence approach discussed above. In other words, the plaintiff must present material evidence as to each of the five elements of general negligence--duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause, *Kilpatrick v. Bryant,* 868 S.W.2d 594, 598 (Tenn.1993); *Bradshaw v. Daniel,* 854 S.W.2d 865, 869 (Tenn.1993)--in order to avoid summary judgment. Furthermore, we agree that in order to guard against trivial or fraudulent actions, the law ought to provide a recovery only for "serious" or "severe" emotional injury. *Burgess v. Superior Court (Gupta),* 2 Cal.4th 1064, 9 Cal.Rptr.2d 615, 618, 831 P.2d 1197, 1200 (1992); *St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649, 653 (Tex.1987). A "serious" or "severe" emotional injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case."

11

> *Rodrigues v. State,* 52 Haw. 156, 283, 472 P.2d 509, 520 (1970); *Paugh v. Hanks,* 6 Ohio St.3d 72, 77-78, 451 N.E.2d 759, 765 (1983); *Plaisance v. Texaco, Inc.,* 937 F.2d 1004, 1010 (5th Cir.1991); Prosser and Keeton on the Law of Torts, § 54, at 364-65, n. 60. Finally, we conclude that the claimed injury or impairment must be supported by expert medical or scientific proof. *See Leong v. Takasaki,* 55 Haw. 398, 520 P.2d 758, 766-67 (1974) ("the plaintiff should be permitted to prove medically the damages occasioned by his mental responses to defendant's negligent act").

*Id.* at 446. Appellees defend the finding of the trial court that *Camper* is to be distinguished from the case at bar. Their argument is that a distinction must be made between negligence resulting in "wrongful birth" and from "failure to warn" on the one hand and negligent infliction of emotional distress on the other hand. However, the language quoted above clearly suggests that when, as here, the injury to be compensated is of primarily of an emotional nature, no such distinction exists. The damages recoverable for negligence of this nature have been clearly defined. If liability is established, all damages foreseeably proceeding from the birth and proximately caused by the act or omission of the defendant shall be recoverable, "including damages for emotional distress." *Owens v. Foote,* 773 S.W.2d 911, at 913 (Tenn. 1989) (citing *Smith v. Gore,* 728 S.W.2d 738, 751 (1987)).

## IV.        THE NEED FOR EXPERT TESTIMONY

It is difficult to imagine a more tragic and heart-wrenching fate than that which has befallen the Amos family. Yet, adequate consideration on appeal requires delineation of what this case is and what it is not. It is a suit for negligence alleging failure to warn and wrongful birth.

It is not a suit for wrongful death of Julie Amos. It is not a suit by Ronald Amos for loss of consortium of Julie Amos. It is not a suit for the wrongful death of Alison Amos. It is not a suit for physical injury to Ronald Amos, Julie Amos or Alison Amos.

The seeds of this tragedy were planted in 1984 in the introduction by transfusion into the blood of Julie Amos of the HIV virus. It is neither alleged in the complaint nor established by the proof that Vanderbilt was at fault in the introduction

12

of the HIV virus in the bloodstream of Mrs. Amos. Her subsequent death resulted from the inexorable progression of the HIV virus into Acquired Immune Deficiency Syndrome. The minor child, Alison Amos, died because of the inter uteral transmission of the HIV virus into her blood by her innocent and unknowing mother. This death resulted from the complications of AIDS.

The sole basis upon which Vanderbilt is charged with fault in this case is in the failure of Vanderbilt, after the development in 1985 of tests that could detect the HIV virus, to pursue a retroactive process to identify and warn former patients, such as Julie Amos, of possible exposure to the HIV virus because of prior transfusions. Inherent in the jury verdict are findings of duty, breach of duty, injury or loss, causation in fact, and proximate cause. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). As to the estate of Julie Amos there is substantial and material evidence to support the jury verdict as to fault and this portion of the jury verdict cannot be disturbed. *Whitaker v. Harmon*, 879 S.W.2d 865 (Tenn. Ct. App. 1994).

Under whatever terminology is used, this case sounds in negligence and aside from the stipulated birth, medical and funeral expenses of $32,884.07 in the delivery, treatment and death of Alison Amos, all damages asserted result from negligent infliction of emotional distress.

*Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996) is a landmark in the efforts of the Tennessee Supreme Court to come to grips with the almost totally subjective nature of injuries involving emotional distress. Following a comprehensive review, the Tennessee Supreme Court held compensable only "severe or serious" emotional injury shown by an expert to be of such a degree that a reasonable person normally constituted would be unable to cope with the attendant mental stress. 915 S.W.2d 437, 446.

*Camper* was followed the same year by *Ramsey v. Beavers*, 931 S.W.2d 527 (Tenn. 1996) wherein the Supreme Court integrated the "zone of danger" rule formulated in *Shelton v. Russell Pipe & Foundry Co.,* 570 S.W.2d 861 (Tenn. 1978) into the general negligence framework. Said the court:

> We reiterate that plaintiff must establish that defendant's

negligence factually and legally caused plaintiff to suffer serious or severe emotional injuries. As we made clear in *Camper*, our ruling does not provide recovery for "every minor disturbance to a person's mental tranquility." *Barnhill v. Davis*, 300 N.W.2d 104, 107 (Iowa 1981), but only for serious or severe emotional injuries. A " 'serious' or 'severe' emotional injury occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Camper v. Minor*, 915 S.W.2d at 446.

Our holding in *Camper* and here should not be construed to allow recovery for fright or fear alone. Likewise, hurt feelings, trivial upsets, and temporary discomfort would not be sufficient for recovery. Only those serious or severe emotional injuries which disable a reasonable, normally constituted person from coping adequately with the stress are sufficient to form the basis for recovery. Additionally, the "claimed injury or impairment must be supported by expert medical or scientific proof." *Id.*

931 S.W.2d 527, 532 (Tenn. 1996).

Appellees argue that emotional damages are "parasitic" to their claim of wrongful birth and thus recoverable. In support they cite *Kush v. Lloyd*, 616 So.2d 415 (Fla. 1992), wherein the Supreme Court of Florida held:

[W]e are not certain that the impact doctrine ever was intended to be applied to a tort such as wrongful birth. Prosser and Keeton state that the impact doctrine should not be applied where emotional damages are an additional "parasitic" consequence of *conduct that itself is a freestanding tort apart from any emotional injury.* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 54, at 361-65 (5th ed. 1984). The American Law Institute is in general accord. Restatement (Second) of Torts § 47 & § 47 cmt. b (1965). Obviously, the [plaintiffs] have a claim for wrongful birth even if no emotional injuries had been alleged.

616 So.2d 415, 422 (Fla. 1992).

Under *Camper* and *Ramsey*, even if one accepts the "parasitic" argument in *Kush*, the law of Tennessee would still require that the "parasitic" damages be established by expert testimony. More clearly analogous to the case at bar is *McCracken, et al. v. City of Millington*, NO. 02A01-9707-CV-00165, 1999 WL142391 (Tenn. Ct. App. 1999). In this case, Jona McCracken sought damages as the result of an automobile accident in which her husband was fatally injured and she

was physically injured. She also sought loss of consortium damages for the brief period that her husband survived the accident. In addition, she sought damages for the negligent infliction of emotional distress. The trial court found that she had suffered compensatory damages of $175,000 of which $46,250 was recoverable from the City of Millington because the City was 25% at fault. It might well be said that her claim for emotional injury was "parasitic" to her claim for personal physical injuries and loss of consortium, as the trial court found that $100,000 of her damages were from emotional injury and remaining $75,000 from the physical injury and loss of consortium.

In disallowing damages for negligent infliction of emotional distress the Western Section of the Court of Appeals held:

> Even assuming that Jona's emotional injuries were foreseeable, however, we would still find that Jona is not entitled to recover damages for negligent infliction of emotional distress. A plaintiff may recover under this legal theory only if he or she has suffered a serious or severe emotional injury. *See Ramsey*, 931 S.W.2d at 532; *Camper*, 915 S.W.2d at 446 (citations omitted). Additionally, the plaintiff's serious or severe injury must be supported by expert medical or scientific proof. *See Ramsey*, 931 S.W.2d at 532; *Camper,* 915 S.W.2d at 446 (citing *Leong v. Takasaki,* 520 P.2d 758, 766-67 (Haw. 1974)). The plaintiff's injury is sufficiently serious or severe if "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Ramsey*, 931 S.W.2d at 532 (quoting *Camper*, 915 S.W.2d at 446).
>
> * * *
>
> Additionally, we find that Jona has failed to prove by expert medical or scientific proof that her emotional injuries were severe or serious. According to Jona's psychiatrist, her symptoms were "within the normal grieving process and may not lead to any future long term complications." Thus, under the definition of "severe or serious injury" adopted by our supreme court in *Camper* and *Ramsey*, we conclude that Jona has failed to carry her burden of proof with respect to this issue.
>
> In light of our discussion above, we find that the requirements of *Ramsey* have not been satisfied in the instant case and consequently hold that the trial court erred in its assessment of Jona's damages. On remand, the court should reduce its prior assessment of Jona's damages by $100,000.00, the amount that the court assigned as damages for negligent infliction of emotional distress.

15

*McCracken, et al. v. City of Millington*, No. 02A01-9707-CV-00165, 1999 WL142391, ** 11-12 (Tenn. Ct. App. Mar. 17, 1999).

At the conclusion of all of the proof in this case, Vanderbilt renewed its motion for a directed verdict as to emotional damages. The trial court held:

> THE COURT: Okay. The issue of emotional distress, the Court overrules the defendant's motion for two reasons. First of all, this is a – that's a good word – parasitic element of damages in this case. And, secondly, even if that were not the case, there is some proof in this case both by direct testimony as to the suffering of persons in a conceptual same situation as the plaintiffs, the deceased and the living plaintiff. And thirdly, again, you know, the effect and diagnosis of AIDS in this case in and of itself would cause any normal person to have immediate emotional distress. The Court will make judicial knowledge of that.

*Camper* and *Ramsey,* in expanding the right to recover damages for negligent infliction of emotional distress, struck a balance that does not allow the court to take judicial notice as a substitute for expert testimony that plaintiff's injuries are "severe or serious". The Supreme Court struck the balance by requiring expert testimony and thus far has only vitiated the need for expert testimony in cases of intentional infliction of emotional distress. In the November 15, 1999 decision in *Wayne Miller, et al. v. Wilbanks, et al.*, 8 S.W.3d 607 (Tenn. 1999), the Supreme Court held:

> In cases of negligent infliction of emotional distress, however, the conduct giving rise to the tort is not marked by extraordinary or outrageous elements inherent in intentional conduct. Thus, concerns with unwarranted claims are not addressed by the kind of conduct that must be proved to obtain damages for emotional distress. In the absence of any reliable indicia of a severe mental injury suggested by the conduct, some safeguard must be imposed to limit frivolous litigation. Accordingly, when the conduct complained of is negligent rather than intentional, the plaintiff must prove the serious mental injury by expert medical or scientific proof. See Camper, 915 S.W.2d at 446.

8 S.W.3d 607, 614-15 (Tenn. 1999).

If there is to be an "AIDS" exception to the expert testimony requirement of *Camper, Ramsey* and *Miller*, it must come from the Supreme Court of Tennessee.

While the words "trivial" and "fraudulent" have no applicability in the face of this tragedy, the definition of "serious" or "severe" cannot provide a basis for judicial notice, but expert testimony is required to carry the plaintiff's burden of proof to show that ". . . a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996).

Appellee asserts that *Camper* should not be given retroactive application under the facts of this case. While it is true that retroactive application of a statute affecting vested substantive rights is constitutionally prohibited under Article 1, Section 20 of the Tennessee Constitution, evolving changes in the common law pronounced by adjudication are not so inhibited. *Dupuis v. Hand*, 814 S.W.2d 340, 343 (Tenn. 1991); *Davis v. Davis*, 657 S.W.2d 753 (Tenn. 1983). Reliance on *Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516, 540 (Tenn. 1977) is misplaced. That case involved not a change in common law, but rather the failure of an existing statute to pass constitutional muster. We find more persuasive the situation in which a common law rule is changed or an existing remedy is abolished by common law. In this regard, the progression of cases dealing with comparative fault are instructive.

The Supreme Court's decision in *Camper v. Minor* expanded a plaintiffs ability to recover for emotional distress. The Supreme Court's decision in *Macintyre v. Balentine* expanded the ability of a plaintiff to recover for negligence. *See McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). The *MacIntyre* court abolished the contributory negligence bar, the last clear chance doctrine, and right to contribution *pro rata* among joint tortfeasors as it had existed under prior common and statutory law. The *Camper* court "abolished" the exclusivity of the "physical manifestation" and "zone of danger" doctrines.

According to Plaintiffs the *McIntyre* decision would not have been retroactively applied to affect the right of an individual to recover under the Uniform Contribution Among Tortfeasors Act. The Supreme Court addressed this retroactive application in *Bervoets v. Harde Ralls Olds-Pontiac, Inc. Bervoets* concerned a contribution case brought under the aforementioned act. For various and sundry reasons the case was tried and twice retried. The second retrial took place after the

Supreme Court issued its well-known opinion in *McIntyre,supra.*

> *Bervoets* concerned the following statement from *McIntyre*:
>
> [B]ecause a particular defendant will henceforth be liable only for the percentage of a plaintiff's damages occasioned by that defendant's negligence, situations where a defendant has paid more than his "share" of a judgment will no longer arise, and therefore the Uniform Contribution Among Tortfeasors Act, T.C.A. § 29-11-101--106 (1980) will no longer determine the apportionment of liability between co-defendants.

833 S.W.2d at 58. Adanac, the defendant in contribution, appealed the trial court's denial of its motion to dismiss Safeco's suit brought under the "abolished" statute. The Court of Appeals affirmed the trial court, and the Supreme Court granted Rule 11 application to "clarify the situation." *Bervoets v. Harde Ralls Pontiac-Olds, Inc. et al.,* 891 S.W.2d 905 (Tenn. 1994, reh. granted 1995). Said the court:

> Although we certainly did not intend in *McIntyre* to totally abolish the remedy of contribution, it is obvious from the above-quoted passage that we did intend that the "pro rata share of damages" approach of the UCATA, which provides that the fault of the parties is not to be considered in determining each party's share of damages, should not continue to be utilized after the *McIntyre* decision was released. Because we intended to adopt a comprehensive scheme of comparative fault in *McIntyre*, and because the "pro rata share" approach set forth in the UCATA is in direct conflict with such a scheme, we felt it necessary to explicitly provide such guidance to the trial courts charged with the duty of trying tort cases in this state.
>
> Although Safeco readily admits that the "pro rata share" approach to contribution is inconsistent with the principles of comparative fault, it contends that our substantial dictum regarding contribution in *McIntyre* should not apply to the retrial in this case for two basic reasons. First, Safeco contends that it had an expectation that it would be able to pursue a UCATA-type contribution claim against Adanac at the time it entered into the settlement agreement, that this expectation constituted an accrued or vested right, and that it is therefore impermissible to retroactively apply the principles of *McIntyre* so as to deprive it of that vested right. We are not convinced, however, that the retroactive application of *McIntyre* in fact serves to deprive Safeco of any "right," vested or otherwise. In fact, it is entirely possible that Safeco could actually obtain a better result under the principles of comparative fault than it could under the UCATA approach.

*Bervoets,* 891 S.W.2d, at 907. The well settled point is that there can be no vested right in an existing law which precludes its orderly change when public policy so demands. *See Cavender v.Hewitt*, 145 Tenn 471, 239 S.W. 767, 770 (1922). Retroactive application of *Camper* is beneficial to the appellee insofar as *Camper* expands the right to recover for emotional injury. It hurts the appellee only because it "strikes a balance" against such expanded scope of liability by requiring expert testimony to prove that the emotional injuries claimed were "severe" or "serious". This case was in the "pipeline" at the time *Camper* was decided in 1996. What is involved in this case is neither constitutional nor statutory but simply evolution of the common law by common law adjudication. Consistency requires and fairness dictates that *Camper* apply to this case. *Davis v. Davis*, 657 S.W.2d 753 (Tenn. 1983); *Luna v. Clayton*, 655 S.W.2d 893 (Tenn. 1983); *Lease v. Tipton*, 722 S.W.2d 379 (Tenn. 1986).

There being no competent proof of damages to Mrs. Amos beyond the medical expenses of Alison's birth and death, the award of damages will be modified to reflect the damages shown. Our holding comports with the action of the trial court in that it found Vanderbilt did not act recklessly or intentionally.

## V.     DISPOSITION

The parties have raised several other issues on appeal. Our resolution of the two above necessarily pretermits those not mentioned in this opinion. The verdict of the trial court is modified as follows. Inasmuch as the plaintiffs failed to present expert testimony of severe emotional injury consistent with the rule in *Camper v. Minor*, 915 S.W.2d 437, 440 (Tenn. 1996), the award to Julie Amos is reduced to reflect the medical damages proven, *i.e.,* the medical expenses of $32,884.07, associated with Alison's birth and death. The jury award to Ron Amos is vacated. The verdict is affirmed as modified. Despite its successful appeal of the issues, costs on appeal are taxed against Appellant Vanderbilt. The cause is remanded for such further proceedings as the trial court may deem necessary. *See* Tenn. R. App. P. 40.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE